COCHRAN, The NEIL. See Case No. 10,087.

COCHRAN (SPARHAWK v.). See Case No. 13,203.

COCHRAN (UNITED STATES v.). See Case No. 14,821.

COCHRANE. In re. See Cases Nos. 6,109 and 6,110.

COCHRANE (BADISCHE ANILIN & SODA FABRIK v.). See Case No. 719.

## Case No. 2,928.

### COCHRANE v. SWARTOUT.

[47 Niles' Reg. 157.]

District Court, S. D. New York. Oct. 31, 1834.

MEANING OF "COAL" IN TARIFF ACT—WEIGHT OF EVIDENCE.

[1. In ascertaining whether or not coke is within the designation of "coal" in the tariff act, the intention of congress may be inquired into, as well as the commercial sense of the term, as understood by merchants.]

[2. While in some cases, a jury may decide a question of fact according to the number of witnesses, yet, when the testimony is mere matter of opinion, they must consider the intelligence of the witnesses, and the manner in which they testify.]

At law. This was a suit [against Samuel Swartout, collector of the port of New York] to recover the amount of certain duties paid by the plaintiff [Rupert J. Cochrane] on a quantity of coke imported from England, and on which the collector had charged a duty of 6 cents a bushel, the plaintiff contending that the article was free, as non-enumerated in the tariff. As there are some parts of this country where the article may not be known under the name of "coke," it may be proper to remark that it is charred coal, from which the bitumen, sulphur, ammonia and other volatile matter has been extracted by fire, and the article reduced to a sort of cinder. In this state it is better adapted for some particular branches of iron manufacture, than coal in its natural form, and in England immense quantities of coal are charred or coked in ovens to fit it for manufacturing purposes. Formerly the article was scarcely used in England except by smiths or iron manufacturers; but since coal gas has come into general use for lighting towns and cities, coke is produced in such large quantities and sold so much cheaper than coal, that the poorer classes in England use it as fuel for domestic purposes, which it answers tolerably well, producing a clear bright fire devoid of smoke or sulphur, something like anthracite, but not so intense or lasting.

A question was raised by Mr. Price as to whether the plaintiff could maintain the present suit, independent of the facts of the case, inasmuch as he had voluntarily paid the bond which he passed on the entry of the goods, instead of protesting against the legality of the duty and refusing to pay his bond. This question was reserved for further consideration by the court.

Several witnesses were examined on both sides, but nothing of a very decisive nature could be gleaned from their evidence, as regarded the character or denomination of the article in question. Some of the witnesses

said the article was called "coke," or "charred coal," and that these terms were never considered to mean. coal in its natural state. Other witnesses deposed that the article, though having gone through the process of charring. is still coal. It also appeared that, on one or two occasions when the article was imported here, it was invoiced by the name of "coke," though it paid a duty as coal. All the witnesses agreed that if they sent an order for coal, without specifying the quality, and were sent coke, they should not consider their order complied with.

Before THOMPSON, Circuit Justice, and BETTS, District Judge.

THOMPSON, Circuit Justice, charged the jury that they were to take it for granted that the plaintiff could maintain the present suit against the defendant,—the question on that part of the subject having been reserved by the court for further consideration. The only question then to be considered was whether the article in question, which had paid 6 cents a bushel, was subject to that duty; or whether it was coal, within the meaning of the tariff law. They had been told that they were to decide the question according to the greater number of witnesses. This proposition might hold good in some cases, but not where the question depended upon the opinion of witnesses. In reference to a fact, the jury might depend upon the number of witnesses, and in that case the evidence of the greater number would be a safe criterion to judge by; but. in a mere matter of opinion, the jury were to found their judgment on the intelligence of the respective witnesses and their manner of giving testimony, and by that means ascertain whether they could place more confidence on one side than the other. If the mere number of witnesses was to be relied on, the trial of a case might take up entire weeks, as a party might bring a thousand witnesses into court. Therefore the jury would judge from the intelligence of the witnesses, and from that source draw a line which would lead them to the truth.

With respect to the construction of the law, the general rule was that, if the jury entertained any doubt as to its meaning, they would then resort to collateral circumstances to assist themselves in ascertaining it, but the cardinal rule of inquiry was, what was the intention of congress in passing the law? The rule settled by the supreme court, and in which this court fully acquiesced, in relation to the law, was that they were to apply to it the practical commercial sense of the words, and use them as understood by merchants. But this rule had been pressed by the plaintiff further than the court was inclined to admit it. It was not because men were merchants that the jury were to be entirely bound by their opinions. The only reason why their opinions should have more weight than those of others was because they were supposed to be better acquainted with articles of commerce. The question to be considered was whether the article was known as a fair commercial article of trade, and imported and used as such. If the article had been imported here for many years as coke, the court would not hesitate to say that it was not coal; and that, as congress was presumed to be acquainted with mercantile terms, it intended that the article should be free. Was then the article known by the name of "coke," as contradistinguished from coal? If the jury were of that opinion, then it was not subject to duty; but if they thought that congress had included it under the generic term of "coal," then it was subject to duty. Nor would it be doing any violence to language to call it coal; some of the witnesses said it was coal, although it had been rendered pure, or nearly pure, by having gone through an operation by which the various particles were extracted from it by heat. A witness had been asked, at what point of the operation did it become coke? and he answered that, when it ceases to smoke, it becomes coke. Now they could not tell if this was the case with the article in question, nor was there any evidence to show them that this was the kind of article imported by the plaintiff. But, supposing that it was, did congress mean that it should be free? Was there anything in the law to induce them to believe that the legislature so intended; or was the article so advantageous to their manufactures, or anything else, as to be fair to assume that the legislature meant to class it under the generic name of "coal"? Witnesses had been asked whether, if they sent for coal, would coke be sent them. The court believed that men never do their business in that way, or send for coal without designating the kind; therefore, the jury could not infer anything from the answer given to that question.

On the whole, the question was one of fact, and the court submitted it to the jury. If they thought that the legislature meant to include coals of all kinds, and that this article came under the generic name of "coal." then the plaintiff could not recover; but, if they thought that the legislature did not mean to include the article under the generic name, then their verdict would be for the plaintiff.

The jury retired for nearly three hours, and, there being no likelihood of their agreeing, they were then discharged.